UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**United States Courts**
**Southern District of Texas**
**FILED**

JUL 1 8 2002

Michael N. Milby, Clerk

| | |
|---|---|
| MARVIN GOLDFARB, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EL PASO CORPORATION, WILLIAM WISE, RODNEY D. ERSKINE and H. BRENT AUSTIN,<br><br>Defendants. | No.<br><br>**H -02-2717**<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Marvin Goldfarb, by his attorneys, for his Class Action Complaint (the "Complaint") alleges the following upon personal knowledge as to himself and his own acts and upon information and belief based upon the investigation of plaintiff's attorneys as to all other matters. The investigation includes the thorough review and analysis of public statements, publicly filed documents of El Paso Corporation ("El Paso" or the "Company"), press releases, news articles and the review and analysis of accounting rules and related literature. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.      This is a securities class action on behalf of public investors who purchased the common stock of El Paso during the period from July, 25, 2001, to May 29, 2002 (the "Class Period").

2.      El Paso is a Delaware corporation headquartered in Houston, Texas. The Company is a North American provider of natural gas services, with core businesses in natural

gas production, gathering, processing and transmission.  The Company's operations are segregated into four primary business segments: 1) Pipelines; 2) Merchant Energy; 3) Production; and 4) Field Services. These segments are strategic business units that provide a variety of energy products and services, including liquified natural gas transport and receiving, petroleum logistics, power generation and merchant energy services.

3.     On July 25, 2001, the first day of the Class Period, defendants disseminated a press release touting El Paso's "exceptional" second-quarter results, and claiming that the Company was on track to achieve significant growth during 2001.  The press release fails to disclose, however, that the Company was engaged in a scheme to artificially inflate the Company's revenue and stock price by improperly manipulating the natural gas market. Defendants' scheme included a plan to artificially boost the Company's trading volume through sham "round-trip" trading of natural gas and to artificially increase the demand for natural gas, thus artificially raising natural gas prices, by withholding capacity from the Company's pipelines to California.

4.     Defendants facilitated their round-trip trading scheme through the creation of Gemstone -- an off-the-books, Cayman Islands partnership, similar to the off-books partnerships created by Enron Corp.  Gemstone enabled defendants to keep $950 million in debt off the Company's balance sheet, which made the Company an attractive trading partner to other energy traders, while El Paso shareholders remained liable for the debt.

5.     During  2001, California's energy prices soared as a result of El Paso's scheme and other energy traders' improper manipulation of the natural gas market.  The sudden increase in demand and reportedly seven-fold increase in California's natural gas prices created a highly volatile market and caused the Federal Energy Regulatory Commission ("FERC") to investigate

the trading practices of El Paso and other energy traders. This government scrutiny of energy traders' trading and accounting practices brought energy prices back to more realistic levels. As a result, defendants were unable to continue engaging in sham trading and unable to artificially inflate El Paso's revenue results.

6.      On May 29, 2002, the last day of the Class Period, defendants revealed the problems with its trading business. On that day, defendants also disclosed that the Company would slash its trading workforce by half and sell off hundreds of millions of dollars in assets in order to reduce its debt. This news caused a twenty-three percent (23%) plunge in El Paso's stock price, its largest decline since the Company went public in 1992.

7.      Approximately two weeks after the twenty-three percent drop in El Paso's stock price, the Company announced on July 12, 2002, that it received a subpoena, from the Houston office of the United States Attorney, for Company documents concerning round-trip trades of natural gas.

8.      This case involves defendants' material omissions and the dissemination of materially misleading statements concerning the energy-trading and accounting practices at El Paso. These misleading statements and omissions drove El Paso's stock price to a Class Period high of $53.22 on August 2, 2001, during which time the Company was artificially manipulating energy demand and artificially inflating its trading volume, to a Class Period low of $27.01 per share on May 29, 2002, the last day of the Class Period and the day defendants revealed that the Company could not sustain its artificially inflated revenue numbers. Defendants' sham trades and failure to fully disclose El Paso's energy-trading and accounting practices artificially inflated stock prices acted as a fraud on the market while the Class has been damaged thereby.

24

## JURISDICTION AND VENUE

9.      The claims asserted arise under §§10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act" or the "1934 Act"). Jurisdiction is conferred by §27

of the 1934 Act.  Venue is proper pursuant to §27 of the 1934 Act as defendant El Paso and/or

the individual defendants conduct business in and the wrongful conduct took place in this

District.

## THE PARTIES

10.     Plaintiff Marvin Goldfarb purchased El Paso publicly traded securities as detailed

in the attached Certification and was damaged thereby.

11.     Defendant El Paso provides a variety of energy products and services, including

natural gas natural gas production, gathering, processing and transmission, liquified natural gas

transport and receiving, petroleum logistics, power generation and merchant energy services.

12.     Defendant William Wise ("Wise") was during the Class Period, and at the time of

the wrongs alleged herein, the Chairman, President, Chief Executive Officer and a director of El

Paso.

13.     Defendant Rodney D. Erskine ("Erskine") was during the Class Period, and at the

time of the wrongs alleged herein, President of El Paso.

14.     Defendant H. Brent Austin ("Austin") was during the Class Period, and at the time

of the wrongs alleged herein, the Chief Financial Officer ("CFO") of El Paso.

15.     Defendants Wise, Erskine and Austin are sometimes referred to herein as the

"Individual Defendants."  They are liable for the false statements pleaded herein, as those

statements were "group-published" information.

16.     Because of the Individual Defendants' positions with the Company, they had

knowledge of and the ability and duty to prevent such scheme, they had access to the adverse

undisclosed information about the Company's business, operations, operational trends, financial

statements, markets and present and future business prospects via access to internal corporate

documents (including the Company's operating plans, budgets and forecasts and reports of actual

operations compared thereto), conversations and connections with other corporate officers and

employees, attendance at management and Board of Directors meetings and committees thereof

and via reports and other information provided to them in connection therewith.

17.     It is appropriate to treat the Individual Defendants as a group for pleading

purposes and to presume that the false, misleading and incomplete information conveyed in the

Company's public filings, press releases and other publications as alleged herein are the

collective actions of the narrowly defined group of defendants identified above. Each of the

above officers of El Paso, by virtue of their high-level positions with the Company, directly

participated in the management of the Company, was directly involved in the day-to-day

operations of the Company at the highest levels and was privy to confidential proprietary

information concerning the Company and its business, operations, growth, financial statements,

and financial condition, as alleged herein. Said defendants were involved in drafting, producing,

reviewing and/or disseminating the false and misleading statements and information alleged

herein, were aware, or recklessly disregarded, that the false and misleading statements were

being issued regarding the Company, and approved or ratified these statements, in violation of

the federal securities laws.

18.     As officers and controlling persons of a publicly held company whose common

stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the

New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities

laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with El Paso, each of the Individual Defendants had access to the adverse undisclosed information about El Paso's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about El Paso and its business issued or adopted by the Company materially false and misleading.

20.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or

opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

21.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of El Paso common stock by, *inter alia*, disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding El Paso's business, operations, management and the intrinsic value of El Paso common stock and caused plaintiff and other members of the Class to purchase El Paso securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

22.     El Paso provides a variety of energy products and services, including natural gas natural gas production, gathering, processing and transmission, liquified natural gas transport and receiving, petroleum logistics, power generation and merchant energy services.

23.     During the Class Period, defendants improperly manipulated the energy market and inflated El Paso's trading volume through the use of a "round-trip" trading scheme.   Round-trip trades are sham trades in which two trading companies make back-and-forth, mirror-image trades – simultaneously buying and selling the same energy to each other at exactly the same price – thus inflating trading volume and misleading investors.

24.     To facilitate its round-trip trading scheme, to impress credit rating companies and to appear as an attractive trading partner, defendants chartered Gemstone – a Cayman Islands-based company, partially financed by granting Gemstone the title to five power plants in which El Paso had invested approximately $500 million.   Gemstone was an off-books partnership,

similar to those employed by Enron Corp. ("Enron") before its collapse, which allowed El Paso to keep $950 million of debt off the Company's balance sheet. However, El Paso shareholders remained liable for the debt, which could require El Paso to issue $2 billion in stock if the Company's share prices or credit rating fell below a certain level.

25.     Each of the Individual Defendants and El Paso are liable in that they inflated the price of El Paso stock by causing and participating in the scheme to increase trading volume and reduce balance sheet debt, making false and misleading statements and omitting material adverse information. The defendants' wrongful course of business(i) artificially inflated the price of El Paso's stock during the Class Period; (ii) deceived the investing public, including plaintiff and other Class members, into acquiring El Paso's securities at artificially inflated prices; and (iii) permitted El Paso to grow and benefit economically from the wrongful course of conduct.

**Defendants' Misleading Statements and Material Omissions During The Class Period**

26.     On July, 25, 2001, the first day of the Class Period, defendants disseminated a press release titled "El Paso Reports 36-Percent Increase in Second Quarter 2001 Adjusted Earnings Per Share." The press release includes a statement by defendant Wise that the Company was "on track to deliver more than 20 percent earnings per share growth in 2001." The press release, touting "exceptional results" states in part:

> **El Paso Reports 36-Percent Increase in Second Quarter 2001 Adjusted Earnings Per Share**
>
> HOUSTON, TEXAS, July 25, 2001-**El Paso Corporation (NYSE:EPG) today reported that adjusted diluted earnings per share increased by 36 percent to $0.79 compared with an adjusted $0.58 in the second quarter of 2000. Second quarter adjusted net income rose 40 percent to $413 million in 2001 from an adjusted $294 million in 2000.** The adjusted results exclude net after-tax merger-related costs, asset impairments, and other charges and extraordinary items totaling $506 million in 2001 and $33 million in 2000. Diluted average common shares outstanding totaled 532 million for 2001 compared with 511 million in 2000.

19

Consolidated earnings before interest expense and taxes (EBIT), adjusted for non-recurring items, increased 30 percent to an adjusted $955 million from an adjusted $733 million in 2000.

**"El Paso's earnings momentum continues to be strong, and we are on track to deliver more than 20 percent earnings per share growth in 2001," said William A. Wise, chairman, president, and chief executive officer of El Paso. "Once again, each of our businesses delivered exceptional results. With the strategies and opportunities we have in place, the outlook for El Paso remains excellent."**

For the first six months of 2001, diluted earnings per share increased 39 percent to an adjusted $1.75 from an adjusted $1.26 for the first six months of 2000. Results for both periods exclude the impact of extraordinary gains on the sale of assets and merger-related costs and asset impairment charges. Consolidated EBIT for the first six months of 2001, excluding non-recurring items, increased by 36 percent to $2,048 million. (Emphasis added.)

27.    Defendants knew or recklessly disregarded that the description of the Company's financial performance was misleading because it fails to disclose that the results were partially the result of defendants' improper trading practices. Using an improper practice known as "round-trip" trading – where counter parties agrees to sell and buy back commodities in the same amount and price – defendants artificially raised the volume and revenues of its natural gas trades. The July 25, 2001, press release also fails to disclose that defendants withheld capacity on its pipelines to California to create demand and artificially boost prices.

28.    On August 1, 2001, defendants continued to mislead investors about its trading practices in a publicly disseminated press release which claims that a surge in demand was responsible for the sudden increase in California's natural gas prices. The press release, which fails to disclose that defendats withheld capacity to create the reported demand and boost prices, states in pertinent part:

**Recent Industry Filings Confirm El Paso's Position That Sudden Increases in Demand-Not Market Manipulation-Caused Higher Natural Gas Prices in California**

18

HOUSTON, TEXAS, August 1, 2001-Recent industry filings at the Federal Energy Regulatory Commission (FERC) concerning capacity issues on the El Paso Natural Gas pipeline substantiate El Paso Corporation's (NYSE:EPG) position that the recent surge in demand both east and west of the California border-not market manipulation-was the defining factor in high prices for natural gas in the state. The demand clearly exceeded available pipeline capacity of all pipelines serving Western markets.

These filings have been mischaracterized in the press. They do not address any accusations of market manipulation by the pipeline or its merchant affiliate. In fact, the filings involve a dispute between two groups of customers, those within California and those east of the California border, over how the existing pipeline capacity should be allocated.

29.     In fact, defendants knew or recklessly disregarded that this explanation was false and misleading because it fails to disclose that defendants' market manipulation, in which the Company withheld capacity from its pipelines, was in fact responsible for the sudden demand and price increases.  The press release also fails to disclose that defendants artificially inflated the Company's trading volume through round-trip trading.

30.     On October 21, 2001, defendants announced its third-quarter 2001 results in a press release which states in part:

**El Paso Reports 42-Percent Increase In Third Quarter 2001 Adjusted Diluted Earnings Per Share**

HOUSTON, TEXAS, October 24, 2001—**El Paso Corporation (NYSE:EPG) today reported that adjusted diluted earnings per share increased by 42 percent to $0.78 compared with an adjusted $0.55 in the third quarter of 2000. Adjusted net income rose 43 percent to $405 million in 2001 from an adjusted $284 million in 2000.** The adjusted results for 2001 exclude net after-tax merger-related costs and other non-recurring charges of $203 million, including an estimated $100-million after-tax ceiling test charge on Canadian oil and gas assets. Diluted average common shares outstanding totaled 528 million for 2001 compared with 517 million in 2000.

Consolidated earnings before interest expense and taxes (EBIT), adjusted for non-recurring items, increased 24 percent to an adjusted $928 million from an adjusted $747 million in 2000. The contribution from non-regulated operations rose to 71 percent of total operating EBIT, up from 61 percent in the year-ago period.

17

For the first nine months of 2001, adjusted diluted earnings per share increased 39 percent to $2.53 from $1.82 for the same period in 2000. Consolidated EBIT for the first nine months of 2001, excluding non-recurring items, increased 32 percent to approximately $3 billion versus $2.2 billion in 2000.

**"El Paso continues on track for another record year," said William A. Wise, chairman, president, and chief executive officer of El Paso. "Despite lower natural gas, power, and petroleum prices and a slowing economy, the company achieved outstanding financial results in the quarter, led by the Merchant Energy and Production segments. This performance reflects the strong market positions of each of our businesses, our diversified asset base, and adherence to strict risk management guidelines. Our financial results were distinguished by attractive returns and high-quality, recurring cash earnings. For the full-year 2001, we will generate more than $3.5 billion in after-tax cash flow before capital expenditures. Each of our business segments continues to perform very well, and we remain comfortable with our earnings per share targets of $3.30 in 2001 and $3.60 to $3.70 in 2002,** based on an annual average Henry Hub natural gas price of $3.00 per thousand cubic feet (Mcf)."

31.     In fact, defendants knew or recklessly disregarded that these results were misleading because the Company's financial performance was artificially inflated by boosting its revenue and trading volume through improper round-trip trading and by withholding capacity in order to artificially raise natural gas prices.

32.     On January 21, 2002, the Company issued a press release titled, "El Paso Corporation Reports Fourth Quarter and Full-Year 2001 Earnings, Updates Hedge Position and Earnings Guidance." This press release states that the Company's first quarter 2002 pro forma earnings were $484 million, or $0.90 per diluted share, compared with pro forma earnings of $500 million, or $0.96 per diluted share, in the first quarter of 2001, The press release includes a statement by defendant Wise and states in pertinent part:

**El Paso Corporation Reports Fourth Quarter and Full-Year 2001 Earnings, Updates Hedge Position and Earnings Guidance**

HOUSTON, TEXAS, January 31, 2002-El Paso Corporation (NYSE:EP) today announced that its fourth quarter 2001 pro forma diluted earnings per share increased to $0.79 from $0.78 per share in 2000. Pro forma net income for the

fourth quarter of 2001 was $408 million versus $403 million in the fourth quarter of 2000. Reported diluted earnings per share for fourth quarter 2001, which include asset impairments and merger-related items, were $0.72 versus $0.65 in 2000. Reported net income for fourth quarter 2001 was $375 million compared with $335 million in 2000.

Pro forma fourth quarter earnings before interest expense and taxes (EBIT) increased 5 percent to $940 million compared with $894 million in 2000. Reported fourth quarter 2001 EBIT was $891 million compared with $825 million in 2000.

For the full year, 2001 pro forma earnings per share increased 27 percent to $3.31 compared with $2.60 in 2000. Pro forma net income rose 30 percent to $1.7 billion in 2001 from $1.3 billion in 2000. Reported diluted earnings per share for 2001, which include merger-related costs, asset impairments, and other non-recurring charges, were $0.18 versus $2.57 in 2000. Reported net income for 2001 was $93 million compared with $1.3 billion in 2000. A schedule of non-recurring items has been provided as an attachment to this press release.

Pro forma 2001 EBIT increased 25 percent to $3.9 billion compared with $3.1 billion in 2000. Reported 2001 EBIT was $1.6 billion compared with $3.0 billion in 2000.

**"2001 was another outstanding year for El Paso," said William A. Wise, chairman, president, and chief executive officer of El Paso. "We achieved record financial results across all of our business units in a very difficult market, while successfully completing our merger with The Coastal Corporation. Looking forward, El Paso's strong asset base, financial strength, and commercial skills make it the company best positioned to prosper in a future where most of North America's incremental energy demand will be served by natural gas."**

"Additionally, we continue to make excellent progress on our balance sheet enhancement program, which will reduce the company's debt-to-total capital ratio to 50 percent or below by year end, including the Project Electron and Gemstone debt," Wise continued. "The company issued $863 million of common equity in December 2001 and is making excellent progress on its planned disposition of $2.25 billion in assets. El Paso expects to have firm sales agreements completed for more than half of the targeted sales by the end of the first quarter."

33.     In fact, defendants knew or recklessly disregarded that El Paso's fourth quarter 2001 results were misleading as a result of efedants' improper round-trip trading that artificially raised gas prices and by defendants artificially boosting natural gas prices in California by

withholding capacity on its California pipelines during that state's energy crisis.

34.      On May 2, 2002, defendants disseminated a press release titled "El Paso

Corporation Reports First Quarter 2002 Earnings, Updates Hedge Position." The press release

includes a statement by defendant Wise and states in pertinent part:

> **El Paso Corporation Reports First Quarter 2002 Earnings, Updates Hedge Position**
>
> HOUSTON, TEXAS, May 2, 2002—El Paso Corporation (NYSE:EP) today announced that its **first quarter 2002 pro forma earnings were $484 million, or $0.90 per diluted share. This compares with pro forma earnings of $500 million, or $0.96 per diluted share, in the first quarter of 2001.** Reported earnings for the first quarter of 2002 were $383 million, or $0.72 per diluted share, which includes $101 million, or $0.18 per diluted share, in non-recurring items. The non-recurring items consist of an impairment of the company's investments in power generation assets and oil reserves in Argentina, a ceiling-test charge related to international oil and gas production activities, and the effect of eliminating negative goodwill resulting from the implementation of FAS 141. In the first quarter of 2001, El Paso reported a net loss of $400 million, or $0.80 per diluted share, which included merger-related costs and extraordinary items totaling $900 million, or $1.72 per share.
>
> Pro forma first quarter earnings before interest expense and taxes (EBIT) totaled $1,059 million compared with $1,093 million in 2001. Reported first quarter 2002 EBIT was $684 million compared with a loss of $68 million in 2001.
>
> **"All business segments performed well despite the most challenging macro environment we have faced in several years," said William A. Wise, chairman, president, and chief executive officer of El Paso. "The benefits of the balance and diversity of each segment's business mix was very evident in the first quarter.** In addition, we made excellent progress on our balance sheet enhancement program, announcing or closing $1.75 billion of asset sales since implementing the program in December of last year. We are also pleased to report that we have recently eliminated the rating triggers for the Project Electron and Gemstone debt as well as for the Trinity River minority interest financing."

35.      In fact, defendants knew or recklessly disregarded that these results were

misleading because the Company's revenue was artificially boosted by improper trading

practices.  The press release fails to disclose that the Company's financial performance would

have been even weaker than reported had the Company not artificially inflated its earnings

through improper round-trip trading and manipulation of demand.

36. Approximately four weeks later, on May 29, 2002, and the last day of the Class Period, defendants finally revealed that El Paso was no longer able to sustain its inflated revenues in the highly volatile energy trading market and slashed the Company's profit forecast, from earnings per share of $2.60 to $2.75 per share in 2002, and from $2.75 to $2.90 in 2003. In a press release titled "El Paso Corporation Announces Strategic Repositioning," defendants revealed that the Company would slash approximately half of its trading workforce and sell hundreds of million of dollars in assets and stock in order to reduce its debt. The May 29, 2002, press release states in pertinent part:

### El Paso Corporation Announces Strategic Repositioning

HOUSTON, TEXAS, May 29, 2002—El Paso Corporation (NYSE:EP) today announced a plan to limit its investment in and exposure to energy trading and increase its investment in core natural gas businesses. El Paso's franchise in each segment of the natural gas value chain allows it to distinguish itself from competitors by responding comprehensively and expeditiously to changed market dynamics. The plan demonstrates the power of El Paso's vertically integrated natural gas franchise-breadth of assets and a flexible portfolio of investment opportunities.

"We are solidifying El Paso's leading position in the natural gas industry and assuring future earnings growth," said William A. Wise, chairman, president, and chief executive officer of El Paso Corporation. "By limiting our investment in trading and its demand on corporate credit and liquidity, this plan allows El Paso to utilize its strengthened balance sheet and credit profile to take advantage of significant growth opportunities in the natural gas arena. We will concentrate on developing our excellent portfolio of U.S. natural gas reserves, expanding our LNG business, and building upon our leading natural gas pipeline franchise. This plan builds upon the excellent progress we have made on our balance sheet enhancement plan, addresses evolving credit standards and simplifies our earnings by reducing non-cash earnings to approximately 5 percent of 2003 net income."

The key elements of the strategic repositioning plan announced today include the following:

13

1.Restructuring the Merchant Energy segment.

--Downsize trading and risk management activities.
--Reduce trading personnel by approximately 50%. Achieve $150 million of annualized cost savings.
--Limit working capital investment in trading activities to $1.0 billion.
--Create three separate divisions in Merchant Energy-Power, Petroleum and LNG, and Energy Trading.

2.Further enhance El Paso's credit beyond the plan announced in December 2001.

--Issue $1.5 billion of equity securities.
--Sell San Juan Basin natural gas gathering assets to El Paso Energy Partners for an estimated $800 million.
--Reduce company-wide annual operating expenses by at least $300 million (inclusive of Merchant Energy savings).
--Decrease net debt to total capitalization to approximately 49 percent, including the $1.95 billion of guaranteed debt in the Electron and Gemstone financings.

3.Increase investment in core natural gas assets.

--Increase capital spending in El Paso Production to $2.3 billion to take full advantage of the company's exceptional portfolio of opportunities.
--Pursue an aggressive LNG strategy as outlined to investors in the company's first quarter analyst meeting.
--Continue an active infrastructure investment program.
--Reduce non-cash earnings to approximately 5% of 2003 net income.

**As a result of implementing this plan, El Paso now expects pro forma earnings per share of $2.60 to $2.75 per share in 2002, and $2.75 to $2.90 in 2003.** The   range for both years reflects sensitivities to petroleum and energy trading results. The projections are based on projected NYMEX natural gas prices of  approximately $4.00 per Mcf for the balance of 2002 and calendar year 2003. **The reduction in pro forma earnings guidance is primarily attributable to lower earnings before interest and taxes (EBIT) from Merchant Energy, which is now expected to be $900 million to $1 billion versus the original projection of $1.5 billion. The reduction is due to a sharp drop in trading and customer origination income due to the planned downsizing of the business and a significant decline in margins at the company's Aruba refinery.** The company expects a severance expense of approximately $70

million after-tax spread over the second and third quarters of 2002.

36.     On the same day that defendants disclosed the planned restructuring of El Paso, an article published by <u>Bloomberg</u> reported that "El Paso has been selling assets to reduce its debt, including $2 billion in off-balance-sheet liabilities created through partnerships similar to those used by Enron." The <u>Bloomberg</u> article also reported that the Federal Energy Regulatory Commission was investigating whether El Paso "withheld capacity on its pipelines to California when prices soared in 2000 and 2001."

37.     Investor reaction to the news that El Paso was slashing its profit forecasts and scaling back its energy trading business was sharply negative.  El Paso shares plunged 23 percent (23%) from the previous day's close as a result of these announcements.  The drop in El Paso's stock price was its biggest decline since the Company went public in 1992.

38.     Approximately two weeks after the twenty-percent drop in El Paso's stock price, the Company announced on July 12, 2002, that it has received a subpoena from the Houston office of the United States Attorney.  The subpoena calls for the production of documents concerning round-trip natural-gas trading of the type alleged herein.

## SCIENTER ALLEGATIONS

39.     As alleged herein, defendants acted with scienter in that defendants knew that the round trip trading scheme was being utilized to artificially increase trading volumes, and the stock price, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by

11

virtue of their receipt of information reflecting the true facts regarding El Paso, their control over, and/or receipt and/or modification of El Paso's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning El Paso, participated in the fraudulent scheme alleged herein.

**Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine**

40.     At all relevant times, the market for El Paso's securities was an efficient market for the following reasons, among others:

(a) El Paso's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, El Paso filed periodic public reports with the SEC and the NYSE;

(c) El Paso regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) El Paso was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

41.     As a result of the foregoing, the market for El Paso's securities promptly digested current information regarding El Paso from all publicly available sources and reflected such information in El Paso's stock price. Under these circumstances, all purchasers of El Paso's securities during the Class Period suffered similar injury through their purchase of El Paso's

securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of El Paso who knew that those statements were false when made.

## COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading.

45.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a) Employed devices, schemes and artifices to defraud;

        (b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

        (c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of El Paso publicly traded securities during the Class Period.

46.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for El Paso's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

47.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of El Paso as specified herein.

48.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of El Paso's value and

performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about El Paso and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of El Paso securities during the Class Period.

49.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (I) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

50.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose and effect of concealing El Paso's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

51.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of El Paso's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of El Paso's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired El Paso securities during the Class Period at artificially high prices and were damaged thereby.

52.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that El Paso was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their El Paso securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

53.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

54.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**

**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
AGAINST THE INDIVIDUAL DEFENDANTS**

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     The executive officers of El Paso knew of the trading scheme and prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Individual Defendants controlled other employees of El Paso. El Paso controlled the Individual Defendants and each of its officers, executives and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

57.     The Individual Defendants acted as controlling persons of El Paso within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.     As set forth above, El Paso and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased El Paso publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants, directors and officers of El Paso and their families and affiliates.

61.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

62.     There is a well-defined community of interest in the questions of law and fact

involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d) Whether defendants knew or recklessly disregarded that their statements were false and misleading.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff demands judgment:

1.    Determining that the instant action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding compensatory damages and/or rescission as appropriate against defendants, in favor of plaintiff and all members of the Class for damages sustained as a result of defendants' wrongdoing;

3.    Awarding plaintiff and members of the Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

4.    Awarding such other and further relief as the Court may deem just and proper.

3

DATED: July 17, 2002

CLAXTON & HILL, PLLC

By _Roger F. Claxton_

    Roger F. Claxton
    SBN: 04329000
    Attorney in Charge
    Robert J. Hill
    SBN: 09652100

3131 McKinney Avenue
Suite 700
Dallas, Texas 75204
Telephone:    (214) 969-9099
Facsimile:    (214) 953-0583

PROPOSED LIAISON COUNSEL FOR
PLAINTIFF

LIONEL Z. GLANCY
MICHAEL GOLDBERG
GLANCY & BINKOW LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:    (310) 201-9150
Facsimile:    (310) 201-9160

IRA M. PRESS
KIRBY, MCINERNEY & SQUIRE, LLP
830 Third Ave, 10th Floor
New York, NY 10022
Telephone: (212) 317-2300
Facsimile:  (212) 751-2540

PROPOSED CO-LEAD COUNSEL FOR
PLAINTIFF

**GLANCY & BINKOW LLP**
**SWORN CERTIFICATION OF PLAINTIFF MARVIN GOLDFARB**
**EL PASO CORPORATION SECURITIES LITIGATION**

I, MARVIN GOLDFARB, certify that:

1.    I have reviewed the Complaint and authorized its filing.

2.    I did not purchase EL PASO CORPORATION, the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in EL PASO CORPORATION, during the Class Period set forth in the Complaint are as follows:

I bought 100 shares on 08/06/01 at $53.77 per share
I bought 1 shares on 07/03/02 at $19.30 per share

5.    I have not served as a representative party on behalf of a class under this title during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated:    _7-15-02_

_____
(Please Sign Your Name Above)
MARVIN GOLDFARB