## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

OSCAR S. WYATT, JR., on behalf of himself
and all others similarly situated,

     Plaintiffs,

vs.

EL PASO CORPORATION, et al.,

     Defendants.

CIVIL ACTION NO. H-02-2717

Hon. Lynn N. Hughes

<u>ECF Filed</u>

## JOINT DECLARATION OF JONATHAN M. PLASSE, DAVID R. STICKNEY AND MICHAEL J. PUCILLO IN SUPPORT OF FINAL APPROVAL OF THE PROPOSED SETTLEMENT, PLAN OF ALLOCATION, AND AWARD OF ATTORNEYS' FEES AND EXPENSES

## TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ...................................................................1

II.  HISTORY OF THIS ACTION ...................................................................5

　　A.   Background And The Filing Of The
　　　　Consolidated Complaint .........................................................6

　　B.   Defendants' Motions To Dismiss ...........................................8

　　C.   Settlement Process And Negotiations...................................8

　　D.   The Notice To The Class ........................................................12

　　E.   The Plan Of Allocation ..........................................................13

　　F.   Lead Counsels' Application For Attorneys' Fees
　　　　And Reimbursement Of Expenses........................................17

　　G.   Application For Reimbursement Of Expenses.....................22

　　H.   Active Involvement of Lead Plaintiffs..................................23

III. CONCLUSION    .....................................................................................26

## TABLE OF ATTACHED EXHIBITS

**Exhibit 1:**   Statement of The Honorable Layn R. Phillips

**Exhibit 2:**   The Declaration of Frank C. Torchio

**Exhibit 3:**   September 9, 2002 Retention Agreement Between Oscar Wyatt and
　　　　　　　Goodkind Labaton Rudolph & Sucharow LLP

**Exhibit 4:**   Lead Counsel's Time and Expense Reports

**Exhibit 5:**   Local Counsel's Time and Expense Declarations

**Exhibit 6:**   Joint Declaration of Lead Plaintiffs Jacksonville Police & Fire Pension
　　　　　　　Fund and Oklahoma Firefighters Pension and Retirement System.

**Exhibit 7:**   Declaration of Oscar S. Wyatt, Jr.

1.     We, Jonathan M. Plasse, David R. Stickney and Michael J. Pucillo, do hereby state, under the penalties of perjury, as follows:

2.     Jonathan M. Plasse is a partner in the law firm of Labaton Sucharow & Rudoff LLP.  David R. Stickney is a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP.  Michael J. Pucillo is a named partner in the law firm of Berman DeValerio Pease Tabacco Burt & Pucillo.  These three firms are the Court-appointed Lead Counsel respectively for Co-Lead Plaintiffs Oscar Wyatt, Jr. ("Wyatt"), Jacksonville Police & Fire Pension Fund ("Jacksonville"), and Oklahoma Firefighters Pension and Retirement System ("Oklahoma") (collectively, "Lead Plaintiffs").  The resumes of our respective firms were previously filed with the Court.

3.     This declaration is submitted in support of Lead Plaintiffs' application for (a) final approval of the proposed Settlement for $285,000,000 plus accrued interest (the "Settlement"); (b) the Plan of Allocation; and (c) an award of attorneys' fees equal to 15.438% of the $285,000,000 fund (the "Settlement Fund") plus interest accrued on the Settlement Fund, and reimbursement of expenses of $1,813,312.71 (the "Fee Application").  The purpose of this declaration is to set forth the background of the action and its procedural history, the factual investigation and prosecution, the negotiations that led to the Settlement, the notice process, and the reaction of the Class to the Settlement and proposed Plan of Allocation.

## I.     PRELIMINARY STATEMENT

4.     Defendants will pay a total of $285 million in connection with the Settlement.  Of this amount, $273 million will be paid by El Paso and its applicable insurers, and $12 million will be paid by PricewaterhouseCoopers LLP ("PwC").  We

believe the proposed Settlement is fair, reasonable and adequate, and should be approved. Lead Plaintiffs and Lead Counsel considered a variety of factors in negotiating and deciding to accept and recommend the Settlement.  The principal reasons why we believe the Settlement should be approved include the following:

(a)     The parties reached agreement to settle only after four years of litigation and after protracted negotiations supervised by the Court-appointed mediator, the Honorable Layn R. Phillips.  As set forth in the accompanying Statement of Honorable Layn R. Phillips ("Mediator's Statement") attached hereto as Exhibit ("Ex.") 1, the negotiations required multiple sessions and careful analysis of complex factual and legal issues.  Lead Plaintiffs prepared and provided Judge Phillips with detailed mediation statements and analysis of estimated damages, and also responded to defendants' defenses to liability and damages.  Settlement was reached only after arms-length negotiations by experienced counsel and the Lead Plaintiffs;

(b)     As set forth below, each of the Lead Plaintiffs (Mr. Wyatt, an individual with vast experience in the oil and gas business, as well as Jacksonville and Oklahoma, two sophisticated institutional investors experienced in securities class action litigation) closely supervised, and participated in all aspects of the litigation and negotiations and accepted the Mediator's recommended settlement number;

(c)     The claims and defenses asserted by the parties involved complex factual and legal issues, and the Settlement is in the best interest of the Class considering the amount of the Settlement, the immediacy of recovery to the Class, and the defenses

asserted by El Paso and the additional defendants.[1]  Lead Plaintiffs further acknowledge the expense and length of continued proceedings necessary to prosecute the case against defendants through trial and appeals, and have also considered the uncertain outcome and the risks of further litigation, especially in complex actions such as this action, as well as the difficulties inherent in any such litigation.  Lead Plaintiffs are also mindful of the inherent problems of proof and possible defenses to the federal securities law violations asserted against each of the defendants.  Prosecution through trial and appeals would substantially delay distribution of any recovery to the Class Members.  The Settlement Amount of $285 million in cash plus interest, however, confers an immediate and substantial benefit to the Class;

(d)     Lead Plaintiffs were well informed of the strengths and weaknesses of the claims and defenses prior to reaching settlement, as attorneys and consultants reviewed and analyzed over four million pages of documents, interviewed witnesses, and conferred extensively with their expert consultants;

(e)     At the time of Settlement, there was a significant possibility that had the Court ruled on the defendants' pending motions to dismiss, at least certain of Lead Plaintiffs' claims would have been dismissed.  Continued litigation could have resulted in further narrowing of (and potentially, eliminating) Lead Plaintiffs' claims.

---

[1]  "Class" and "Class Members" means all persons and entities who purchased or otherwise acquired the securities of El Paso from February 22, 2000 through February 17, 2004, inclusive.  Excluded from the Class and as Class Members are Defendants; members of the immediate families of any Individual Defendant; any parent, subsidiary, affiliate, partner, officer, or director of any Defendant who is not an individual; any entity in which any such excluded person has a controlling interest; and the heirs, successors, and assigns of any such excluded person or entity.  Also excluded from the Class and as Class Members are any putative Class Members who properly exclude themselves by filing timely requests for exclusion.

Thus, there were substantial risks that the Class would recover substantially less or nothing at all;

(f)    The amount of the Settlement, $285 million plus interest, is substantial and represents an excellent result for the Class.  It is believed to be the twenty-fifth (25th) largest securities class action recovery since passage of the Private Securities Litigation Reform Act of 1995;

(g)    The Settlement is supported by each of the parties, their respective counsel, and Judge Phillips.  Moreover, the response by Class Members to the Court-approved Notice of the Settlement indicates strong support for the Settlement.   In response to publication of the Summary Notice and after over 600,000 Notices of the Settlement were mailed to potential Class Members, there are just 3 objections and only 25 requests for exclusion (representing approximately 25,123 shares).

5.    The entire Settlement Amount of $285 million (after deduction of Court-approved expenses and attorneys' fees), plus interest accrued beginning at least by January 8, 2007 (when the amount was fully paid into escrow), will be distributed to members of the Class who timely submit valid proofs of claim.  Assuming the Settlement is approved, there will not be any right of reversion to El Paso, PwC or their insurers.

6.    Lead Plaintiffs also seek approval of the proposed Plan of Allocation as fair and reasonable.  For the purpose of allocation, Lead Plaintiffs engaged Forensic Economics, Inc. to perform an economic analysis of the amount of inflation in the prices of the Securities of El Paso on each day of the Class Period.  The Declaration of Frank C. Torchio, attached hereto as Ex. 2, explains the methods used to determine the amount of

artificial inflation in El Paso's securities during the Class Period and the basis for the analysis.

7.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is also applying to the Court for a collective award of attorneys' fees and payment of costs and expenses.   Specifically, Lead Counsel is applying for a fee of 15.438% of the Settlement Amount, which is $43,998,300 million, and requesting reimbursement of incurred expenses totaling $1,813,312.71.  Respectfully, Lead Counsel submit that the Fee Application should be awarded because: (a) it is made pursuant to a fee agreement negotiated at the commencement of this litigation between counsel and Lead Plaintiff Wyatt, who has significant experience in negotiating lawyer's fees for complex litigation, and due to his significant loss in El Paso securities, had a significant financial interest in minimizing his counsel's fees; (b) the fee sought is supported by the amount of time expended by counsel in prosecuting the case, *i.e.* it represents a multiple of 3.5 of the value of counsels' time; (c) the action was prosecuted on a contingent basis; (d) the action involved difficult factual and legal issues; and (e) counsels' efforts resulted in a substantial settlement favorable to the Class.

## II.     <u>HISTORY OF THIS ACTION</u>

8.     The litigation began in July 2002, when a number of related class actions were filed alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act") in connection with investors' purchases of El Paso securities.  As detailed below, the litigation continued for over four years until the parties reached an agreement to settle.

A.      **Background And The Filing Of The Consolidated Complaint**

9.      This is a securities action against El Paso, one of North America's largest independent natural gas producers; its top executives, William Wise, H. Brent Austin, Ralph Eads, Rodney D. Erskine, Ronald L. Kuehn, Jr., and D. Dwight Scott (the "Individual Defendants"); PwC, the Company's auditor; and Credit Suisse First Boston LLC ("CSFB"), an underwriter of El Paso securities (collectively, the "Defendants").

10.      On September 23, 2002, this Court (the "Court") consolidated these cases, and on October 16, 2002, appointed Wyatt as Lead Plaintiff and Jacksonville as a Named Plaintiff.  On November 20, 2002, the Court struck the initial consolidated complaint filed and instructed plaintiffs to refile a complaint totaling less than thirty pages.

11.      On December 12, 2002, Lead Plaintiffs filed their First Consolidated Class Action Complaint in accordance with the Court's instructions, alleging claims under the Securities and Exchange Acts on behalf of persons who purchased or acquired El Paso stock from November 9, 2000 to September 23, 2002.  All Defendants then moved to dismiss the complaint.

12.      On February 17, 2004, while the motions to dismiss were pending, El Paso announced a restatement of its proved oil and gas reserves as of December 31, 2003 (the "reserve restatement").  Additional class action complaints were then filed relating to the reserve restatement.  The restatement cases were consolidated into this action, and on May 26, 2004, the Court reappointed Wyatt as the Lead Plaintiff and Jacksonville as a Named Plaintiff, and also appointed Oklahoma as an additional Named Plaintiff.  The

action was also restyled *Oscar S. Wyatt, Jr., et al. v. El Paso Corporation, et al.* under the same case number.[1]

13. On July 2, 2004, Lead Plaintiffs filed their Second Consolidated Class Action Complaint (the "Complaint") alleging claims on behalf of investors (the "Class") who purchased El Paso securities from February 22, 2000 through February 17, 2004 (the "Class Period"). The Complaint alleges that during the Class Period, El Paso and the Individual Defendants inflated the prices of El Paso securities by making false and misleading statements in SEC filings and publicly disseminated documents which: (1) exaggerated gross revenues and volume due to "round trip" trading ("round trip trading claim"); (2) inflated revenues and earnings by misuses of "mark to market" accounting ("mark to market claim"); (3) hid more than $1 billion of liabilities and another $1 billion of guarantees in off-balance sheet companies controlled by El Paso ("off balance sheet claim"); (4) falsely attributed El Paso's success to legitimate business practices, which success was actually the result of El Paso's manipulation of the California energy markets ("California market claim"); and (5) overstated El Paso's proved oil and natural gas reserves ("reserve claim"). Claims were asserted under Sections 10(b) and 20 of the Exchange Act, and Sections 11, 12 and 15 of the Securities Act.

14. Shortly thereafter, the Court granted the United States Attorney's motion to stay the action pending a criminal investigation into issues related to the reserve restatement. The Court nevertheless allowed the parties to file briefs in connection with defendants' renewed motions to dismiss (described below). The stay prompted by the criminal investigation was ultimately lifted on June 17, 2005.

---

[1] On November 9, 2005, the Court granted a joint application and amended its May 26, 2004 Order to appoint Jacksonville and Oklahoma as co-lead plaintiffs with Mr. Wyatt.

### B.   Defendants' Motions To Dismiss

15.   In August 2004, Defendants made eight separate motions to dismiss the Complaint.   Defendants sought dismissal of each claim asserted in the Complaint, asserting, among other things, that:

(a)   Each of the claims asserted under Section 10(b) of the Exchange Act should be dismissed since Lead Plaintiffs failed to adequately allege scienter;

(b)   Certain of the Section 10(b) claims should also be dismissed since Lead Plaintiffs failed to adequately allege false statements, materiality, or reliance;

(c)   The Section 10(b) claim based on alleged false statements concerning manipulation of the California market was barred by the statute of limitations; and

(d)   Each of the claims asserted under Section 11 of the Securities Act of 1933 should be dismissed due to, among other things, lack of standing, and a failure to adequately allege false statements.

16.   Lead Plaintiffs opposed the eight separate motions, and the motions were fully briefed by October 2004.   Pursuant to the Private Securities Litigation Reform Act of 1995, all formal discovery continued to be stayed pending determination of Defendants' motions to dismiss.

### C.   Settlement Process And Negotiations

17.   In the beginning of 2005, the parties began discussing a process for resolving Lead Plaintiffs' claims.   In general, Lead Plaintiffs believed that they could proceed with settlement negotiations only after they had an opportunity to conduct a sufficient factual investigation in order to assess the strengths and weaknesses of their claims.   Defendants were interested in settlement talks, but were reluctant to allow full

discovery to proceed, particularly while their motions to dismiss were still pending. The parties also recognized the need to address their respective analyses of the amount of damages that Lead Plaintiffs might recover if some or all of their claims were sustained.

18.     The issue of a potential settlement was addressed by the Court at a pre-trial conference held on April 11, 2005. On July 21, 2005, counsel for Lead Plaintiffs and El Paso met and discussed a variety of issues including possible procedures for addressing a potential settlement. At that time, Lead Plaintiffs' counsel again noted their concerns that any settlement negotiations could occur only after they had completed a sufficient factual review regarding their claims.

19.     In an effort to address their respective concerns, the parties discussed a procedure, patterned after a similar approach employed in *In re Waste Management Inc Securities Litigation*, Master File No. H-99-2183 (S.D. Tex.) (which had been pending before Judge Harmon), whereby El Paso would produce documents requested by Lead Plaintiffs in a document repository maintained at the offices of El Paso's counsel (the "repository"), and those documents could be reviewed there by Lead Plaintiffs' counsel and their experts. A confidentiality agreement and order establishing this procedure was entered by the Court on October 3, 2005.

20.     Beginning in mid-October 2005, Lead Plaintiffs' counsel and their experts began reviewing documents in the repository; that review continued through August, 2006. In total, a team of lawyers from our firms and firms working at our direction analyzed approximately 4.8 million pages and approximately 60 Gigabytes of electronic data. The material concerned complex and technical aspects of the natural gas industry, energy trading and accounting, requiring expertise in such areas to analyze and

understand the material.   Consequently, Lead Counsel retained consulting experts to assist the team of lawyers in their review of documents in the repository and to consult with Lead Plaintiffs and their counsel regarding their analyses of the claims.   During this period, Lead Counsel also conducted a series of interviews with potential fact witnesses knowledgeable about certain of Plaintiffs' claims.

21.   On January 6, 2006, El Paso and Lead Plaintiffs filed a Joint Status Report concerning the progress of the settlement process.   Consistent with that report, in its Order dated January 31, 2006, the Court ordered mediation to occur by April 27, 2006, and appointed Judge Phillips (a former United States District Judge) as mediator.

22.   Lead Plaintiffs, Defendants, and various insurers held the first of three mediation sessions under the supervision of Judge Phillips in Houston on April 11 and 12, 2006.   The parties discussed their respective analyses of damages if some or all of the claims were sustained.   By the end of this initial mediation session, however, the parties were still very far apart.   A second two-day mediation session with Judge Phillips followed on May 25 and 26, 2006, in Newport Beach, California.   A third mediation session took place on June 2 and 3, 2006, also in Newport Beach, California.   As set forth below (¶¶57-63), the Lead Plaintiffs actively participated in the process.   Following protracted negotiations, Judge Phillips recommended a settlement amount of $285 million which all parties accepted.

23.   After the settlement figure was determined, counsel for the parties focused on finalizing the settlement.   The parties agreed that if they were unable to resolve disputes among them relating to the settlement documentation, they would bring those disputes to Judge Phillips in the first instance (before seeking Court intervention).   Over

the course of several weeks, the parties engaged in detailed negotiations about specific terms of the settlement. For certain terms, the parties presented their competing positions to Judge Phillips for resolution. On July 28, 2006, Lead Plaintiffs and Defendants entered into a Memorandum of Understanding (the "MOU"), which contained the material terms of a proposed class-wide settlement.

24. On October 26, 2006, the Parties entered into a Stipulation and Agreement of Settlement (the "Stipulation") memorializing their agreement to settle the Action for $285 million, subject to Court approval.

25. Judge Phillips summarized the extensive negotiations in his Statement, attached hereto as Ex. 1.

26. As a result of the process, Lead Plaintiffs were able to meaningfully assess their likelihood of prevailing on the motions to dismiss, the factual and legal defenses they would encounter on motions for summary judgment or at a trial, their likelihood of prevailing on their claims, and the range of damages they might be able to recover if they were successful in proving some or all of their claims.

27. On December 5, 2006, the Court entered an order preliminary approving the Settlement, certifying the Class, directing that settlement notices ("Notice") be sent, and setting a final hearing for March 6, 2007. Pursuant to the Stipulation, defendants and their insurers transferred the $285 million to Lead Plaintiffs' escrow agent by January 8, 2007. That Fund has earned approximately $1,470,000 of total interest through February 9, 2007.

### D.   __The Notice To The Class__

28.     Lead Counsel retained A.B. Data, Ltd. ("A.B. Data") as Claims Administrator, to provide notice of the Settlement to the Class and to administer the claims process.

29.     Pursuant to the Stipulation and the December 5, 2006 Order, A.B. Data commenced mailing of notices on December 13, 2006 to persons identified as record holders of El Paso stock during the Class Period.  Notices were also mailed to approximately 3,109 of the largest brokerage firms, banks, institutions and other nominees, and individuals identified by the brokerage firms as having purchased El Paso securities during the Class Period.  Pursuant to this process, over 600,000 Notices were mailed to Class Members.  In addition, the Notice and Proof of Claim Form was made available on Lead Counsels' respective websites; and on a website specifically created for this litigation, www.elpasosecuritiessettlement.com, which provided additional information, including the proposed plan of allocation.  A Summary Notice was also published once in *The Wall Street Journal* and in the *PR Newswire* on December 22, 2006.  *See* accompanying Affidavit of Anya Verkhovskaya of A.B. Data.

30.     According to the Notice, Class Members had until February 2, 2007 (Postmark date) to mail A.B. Data a request for exclusion from the Class and Settlement. Only 25 potential Class Members (who collectively purchased approximately 25,123 El Paso shares) elected to opt-out of the Class.

31.     The Notice also provided that Class Members had until February 2, 2007 (receipt date) to mail objections to any part of the Settlement to A.B. Data.  As of February 13, 2007, A.B. Data received only 3 objections.  We believe such objections should not prevent Court approval of the the $285 million settlement and respectfully

refer the Court to the accompanying Motion and Memorandum of Law In Support of Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Brief Supporting Settlement and Plan of Allocation") and the Motion and Memorandum of Law In Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses ("Brief Supporting Fee Application").

### E. The Plan Of Allocation

32.     Lead Plaintiffs have proposed a plan of allocation to allocate the proceeds of the Settlement ("Plan of Allocation" or "Plan") among members of the Class. Lead Plaintiffs are seeking approval by the Court of the Plan of Allocation, the details of which are set forth in the Declaration of Frank Torchio, Ex. 2. We believe that the proposed Plan of Allocation is fair and reasonable. Notably, approval of the proposed Plan of Allocation is not a condition of the Settlement.

33.     The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds to those Class Members who suffered economic losses as a result of the alleged fraud and wrongdoing. While all Class Members' claims arise from the same alleged scheme which caused the artificial inflation of the securities they acquired, the amount of such artificial inflation varied throughout the Class Period. Differences of this nature among members of the Class are common in securities litigation and are commonly addressed by a plan of allocation.

34.     We considered different approaches for allocating the recovery to claimants. For the purpose of allocation, Lead Plaintiffs engaged Forensic Economics, Inc. to perform an economic analysis of the amount of inflation in the prices of the Securities of El Paso on each day of the Class Period. The attached Declaration of Frank

C. Torchio, Ex. 2, explains the methods used to determine the amount of artificial inflation in El Paso's securities during the Class Period and the basis for the analysis.

35.     The Settlement Fund, after deduction of attorneys' fees and expenses, and costs related to settlement administration, (the "Net Settlement Fund"), is to be distributed to Class Members based upon the amount of their respective "recognized losses."  The recognized loss with respect to a Class Member's purchase of a particular El Paso security is based upon the damages consultant's calculation of the amount of artificial inflation in that security on the date of purchase.  In computing artificial inflation, the consultant considered the price changes of the particular security in reaction to certain public announcements regarding El Paso, generally reducing those price changes attributable to market forces unrelated to the alleged fraud.  The amount of recognized loss is adjusted based upon when the security was sold, or if the security is still held at the end of the Class Period, the deemed sale price is the holding price, which is equal to the value of the security on February 18, 2004 (the "net recognized loss").  The net recognized loss of all Class Members ("net recognized loss") is then calculated (with a limit of 3% of the Fund allocable to damaged option holders).   To the extent net recognized loss exceeds the amount of Net Settlement Fund, distribution will be made to Class Members based on their *pro rata* share of the Fund.

36.     The Plan of Allocation contains a table for each type of known security of El Paso Corporation.  The table is broken down by dates defining various periods within the Class Period, during which the amount of inflation in the price of the relevant security was the same.  For each such period, the table sets forth an amount, which represents an

estimate of the amount of artificial inflation present in the price of the security during that period.

37.     In response to over 600,000 Notices of the Settlement, there have been no objections to the Plan of Allocation, except that James Thompson objects to the Plan on the grounds that limiting the aggregate recovery of El Paso option purchasers and sellers to 3% of the Net Settlement Fund is "arbitrary" and should be stricken.

38.     There are several reasons why a 3% limitation on distributions related to option transactions is fair, reasonable and appropriate in this case.  First, damages for purchasers of call options and sellers of put options are less than 1.5% of the aggregate damages of  purchasers of all El Paso securities.  *See* Torchio Decl., Ex. 2 at ¶26.  Thus, we believe that the limitation is reasonable on its face and will only come into play if a disproportionate number of options investors file claims.   In addition, and more generally, limiting the amount of the Class's recovery that can go to options claimants is appropriate given the legal status of options claims under Section 10(b) of the Exchange Act.   The Fifth Circuit has never recognized such a claim for damages by option investors, and there are cases that call into question whether purchasers and sellers of such derivative securities should have a claim under  Section 10(b).  Further, courts have approved similar limitations on the aggregate recovery of option purchasers and sellers. *See* Brief Supporting Settlement and Plan of Allocation.

39.     Mr. Thompson was named as a plaintiff in the Complaint and was provided with a meaningful opportunity to review and comment upon the proposed Plan. Specifically:

(a)      After Mr. Wyatt was again designated Lead Plaintiff in May, 2004, Mr. Plasse advised Thompson's counsel that Mr. Thompson would be identified as a plaintiff in an amended complaint, and if a settlement was reached, we would confer with him regarding a proposed plan of allocation and how it related to option purchasers and sellers.

(b)      In October, 2006, and after the parties had agreed to a settlement amount, but before the Plan was finalized, we provided Thompson's counsel with the proposed Plan and additional information he then requested (including information regarding the reasons and support for the 3% limitation). Mr. Plasse then conferred with Thompson's counsel and obtained his comments regarding the plan. At that time, we believed we had provided Thompson's counsel with all the information he and his client had requested. Thompson's counsel then advised Mr. Plasse that he would confer with his client regarding his client's position on the settlement; he also then advised Mr. Plasse of the amount of attorneys' fees that Thompson's counsel believed he should receive. Mr. Plasse informed Thompson's counsel that such amount was excessive.

(c)      In January 2007, Mr. Plasse wrote to Thompson's counsel and stated that if he was interested in joining in the forthcoming fee application, he should prepare a schedule reflecting the amount of time he expended in the action. Thompson's counsel responded by asking for certain information regarding the Plan (some of which had already been provided to him). We then provided Thompson's counsel with our consultant's analysis of the amount of damages suffered by option purchasers and sellers, and a separate analysis of the damages incurred by purchasers of El Paso stock and bonds. We also advised Thompson's counsel that based upon our consultant's analyses,

the amount of damages of El Paso option purchasers and sellers, in the aggregate, was less than 3% of the aggregate damages of purchasers of El Paso stock and bonds. Nevertheless, Mr. Thompson objected to the Plan of Allocation as described above.

### F. Lead Counsels' Application For Attorneys' Fees And Reimbursement Of Expenses

40.    Lead Counsel, on behalf of themselves and other plaintiffs' counsel, jointly request a fee equaling 15.438% of the Settlement Fund (*i.e.*, $43,998,300), as well as a like percentage of the interest accrued on that Fund, and reimbursement of expenses in the amount of $1,813,312.71. Notably, the fee application by Lead Counsel was described in the Notice of Pendency and Settlement sent to potential Class Members beginning on December 13, 2006. More than 600,000 Notices were mailed to Class Members, and Notice was posted on the websites of Lead Counsel and the Claims Administrator on or about December 13, 2006.

41.    Significantly, in response to the Notice, there were only two objections to Lead Counsel's fee application, and the deadline for such objections has passed. We believe that the reaction of the Class supports the requested fee award.

42.    The litigation was undertaken by Lead Counsel on a wholly contingent basis. From the outset, Lead Counsel understood that it was embarking on a complex, expensive and lengthy litigation with no guarantee of compensation for the significant investment of time, money and effort that the case would require. In undertaking the responsibility, Lead Counsel assured that sufficient attorney resources were dedicated to the investigation of the class-wide claims against the defendants and that sufficient funds were available to advance the considerable out-of-pocket expenses required to pursue and complete such complex litigation.

-17-

43.     The fee application is being submitted by Lead Counsel with the prior approval of Lead Plaintiffs and is, in all respects, in accordance with the retention agreement entered into between Mr. Wyatt and Labaton Sucharow prior to his moving for Lead Plaintiff in September 2002. *See* September 9, 2002 Letter, Ex. 3.  That agreement provides that any fee would be contingent upon counsel's ability to obtain a judgment or settlement, and would equal 20% of the first $25 million of recovery, 15% of all amounts in excess of the first $25 million plus reimbursement of expenses.  As noted above, Mr. Wyatt is a sophisticated businessman, and has throughout his career, negotiated numerous fee agreements with lawyers to provide services in complex litigations.  Moreover, due to his large loss in El Paso securities (he purchased or acquired over 4.7 million El Paso shares during the Class Period), Mr. Wyatt had an incentive to minimize his lawyer's fees so as to maximize his recovery here.  Likewise, Jacksonville and Oklahoma suffered substantial losses and their counsel separately negotiated their own fee agreements prior to their appointment as Co-Lead Plaintiffs.  As set forth below, such agreements would have resulted in slightly larger fees than provided in the retention agreement.  Their counsel, however, have agreed to have the Wyatt retention agreement apply to their fee application as well.

44.     Respectfully, the work undertaken by Lead Counsel in prosecuting this case and arriving at this settlement has been challenging.  This Action settled only after Lead Counsel conducted an extensive investigation into the underlying facts; prepared multiple complaints and opposed successive motions to dismiss; analyzed over four million pages of documents in conjunction with expert consultants; and engaged in arduous and protracted settlement negotiations with experienced defense counsel.

Lawyers worked extensively for years to achieve this result. Thus, as of February 12, 2007, the collective lodestar is $12,526,585.50, which represents over 31,648 hours of work devoted to the prosecution of this Action. *See* Time and Expense Reports, attached hereto as Exs. 4 & 5. This total includes over 28,550 hours by Lead Counsel for a lodestar of $11,244,019.25. *See* Time and Expense Reports of Lead Counsel, Ex. 4. The total hours devoted by the three local counsel exceed 2,470 hours for lodestar of $1,082,503.75. *See* Time and Expense Declarations of Local Counsel, Ex. 5. Additional plaintiffs' counsel incurred approximately 560 hours at the direction of Lead Counsel for lodestar of $200,062.50.[2]

45.     The accompanying Time and Expense Reports reflect the name of each lawyer, the hourly rate and the position of each lawyer (e.g., partner or associate) for Lead Counsel and Local Counsel. The hourly rates that were used to calculate the "lodestar" for attorneys are consistent with the hourly rates used in 2006 by other firms in the field of securities class actions generally. The time reported on Exhibit 4 for our respective firms was prepared from contemporaneous, regularly prepared daily time records. The hourly rates were capped at the same rates that the firms used in 2006, notwithstanding that this application is being made in 2007.

46.     Each of us, as the partner in charge of this matter at our respective law firms, has reviewed the underlying time records of our respective firms in this matter. We have done so to confirm that the time reflected on our lodestar report was, in fact, spent on this litigation, and that the time recorded was reasonable and appropriate for the particular task. Further, during the course of this litigation we made a conscious effort to

---

[2] Such firms include the following: Wolf Haldenstein Adler Freeman & Herz LLP;

ensure that work was done by the appropriate level of lawyers, and that time expenditures were reasonable for the task performed.  We believe the lodestar reported on Exhibit 4 for our respective firms represents time expenditures that were reasonable and necessary for the proper prosecution of this case.

47.     Our three firms have maintained daily control and monitoring of all of the work provided by lawyers at our three firms on this case and further reviewed the work and time records of lawyers from the other firms who performed work at our direction. While we have personally devoted substantial amounts of our time to this case over the past several years, we have also utilized other experienced attorneys at our firms to undertake or work with us on particular tasks appropriate to their levels of expertise, skill and experience (for example, negotiations with defendants; researching and drafting briefs; working with experts; and settlement mediation), and more junior attorneys and paralegals to work on matters more appropriate to their experience levels.

48.     The quality of opposing counsel is also relevant in evaluating the quality of the work performed by Lead Counsel.  Plaintiffs were opposed in this case by very skilled and highly-respected counsel.  El Paso was represented by Susman Godfrey LLP, who spared no effort in the defense of their client.  The Individual Defendants, PwC and Credit Suisse were also represented by highly-respected and skilled counsel that vigorously defended the Action on behalf of their clients.

49.     Not only is the amount of the recovery substantial (believed to be among the twenty-five largest securities class action recoveries), but we believe the recovery is exceptional given the circumstances of the case and the amount that the Class may have

---

Pomerantz Haudek Block Grossman & Gross LLP; and Chitwood Harley Harnes LLP.

recovered only after additional years of litigation through trial and appeals. As noted above, Judge Phillips recommended the $285 million based on protracted mediation and analysis of the legal and factual issues in the case. This included analysis of the probability that the defendants would succeed in one or more of their defenses. As a result of this process, Lead Counsel, Lead Plaintiffs and Judge Phillips were fully informed as to the parties' views of the range of possible recovery and the substantial risks of achieving that recovery. Lead Counsel and Lead Plaintiffs accepted the mediator's recommendation of $285 million because they shared the view that it was a substantial recovery for the Settlement Class under the circumstances of the case.

50.     Only two individuals, C. John Malacarne and the Vander Haars, submitted objections to Lead Counsel's requested fee. We believe that the two objections lack merit and respectfully refer the Court to the accompanying Brief Supporting Fee Application.

51.     Both Mr. Malacarne and the Vander Haars correctly observe that the Notice, in addition to specifying the requested fee, provides an estimate of the average recovery per damaged share of $.176 (as required by the Private Securities Litigation Reform Act of 1995). Based on the method for estimating the average recovery per damaged share, the requested fee would cost an average of $.027 per damaged share. The estimated recovery per damaged share of $.176 assumes all owners of the damaged shares elect to participate. Class Members may receive more than the amount referred to above, depending on, among other factors, when their securities were purchased or sold, the number of Class Members who file valid claims, and the amount of interest that has accrued on the available funds as of the time of the distribution. In addition, the per share

recovery may change depending on the date of purchase and by amounts that, under the Plan of Allocation, may be claimed by purchasers of other securities of El Paso.

**G.**     **Application For Reimbursement Of Expenses**

52.     Lead Counsel also requests reimbursement of the expenses reasonably and necessarily incurred by plaintiffs' counsel in the prosecution of this Action in the amount of $1,813,312.71.  Potential Class Members received a description of Lead Counsel's request for reimbursement.  In response to that Notice, no Class Member has objected to the amount of the requested expense reimbursement.

53.     Lead Counsel respectfully submit that the expense application is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.  Exhibit 4 hereto contains schedules itemizing by category the expenses incurred by the three Lead Counsel.[3]  To fund the prosecution of the claims effectively, Lead Counsel created a common litigation fund.  Lead Counsel contributed to this fund and each firm's contribution is reflected in Exhibit 4 in the category of "Contributions to Plaintiffs' Litigation Fund."

54.     As indicated in the attached schedules, Lead Counsel paid aggregate expert fees of $982,537.10 for experts retained by them.  These experts included: Intelometry, Inc., for all areas except for the reserve claim; The Strickland Group for the reserve claim; Bala G. Dharan, Ph.D., CPA for the off-balance sheet claim; Marks Paneth & Shron for accounting issues; Forensic Economics, Inc. and Financial Markets Analysis, LLC for damages issues; and Econ 1 for the California energy market and market manipulation.

---

[3]   Of the amount requested for reimbursement of expenses, $19,425.54 is for expenses incurred by other plaintiffs' counsel acting at Lead Counsel's direction.

55.     In addition, costs were necessarily incurred in connection with Counsels' review of documents produced by El Paso at the repository.  At El Paso's insistence, document review and analysis had to be performed on site under tightly controlled conditions and using specially-designated computers.  (Lead Counsel sought to minimize costs associated with the document review by, *inter alia*, using Houston-based attorneys to perform a significant amount of that review).

56.     Notably, approval of the Settlement is independent from approval of Lead Counsel's application for an award of attorneys' fees and reimbursement of costs and expenses.  Any determination with respect to Lead Counsel's application for an award of attorneys' fees and reimbursement of costs and expenses will not affect the Settlement, if approved.

H.     <u>**Active Involvement of Lead Plaintiffs**</u>

57.     Mr. Wyatt, Jacksonville and Oklahoma are the Court-appointed Lead Plaintiffs.  Mr. Wyatt is the founder and former Chairman and Chief Executive Officer ("CEO") of The Coastal Corporation ("Coastal"), the company that El Paso Corporation ("El Paso") merged with on January 29, 2001; John Keane is the Executive Director-Administrator of Jacksonville, a billion dollar public pension fund organized for the benefit of the current and retired police officers and firefighters of the City of Jacksonville.   Robert Jones is the Executive Director of Oklahoma Firefighters.  Oklahoma Firefighters is a $1.5 billion pension and retirement system with over 21,000 participants, made up of active and retired firefighters throughout Oklahoma.

58.     Mr. Wyatt, Mr. Keane and Mr. Jones were actively involved in this case over several years.  They closely supervised and monitored the progress of this litigation, and played a significant role in all aspects of this case.  Among other things, they

reviewed and commented on drafts of the consolidated complaints that were filed in this action; reviewed and analyzed defendants' motions to dismiss that were filed as to the consolidated complaints, and reviewed and commented on drafts of Lead Plaintiffs' oppositions thereto; and regularly participated in discussions with Co-Lead Counsel concerning significant developments in this litigation, including the status of the pleadings, motions to stay, requests for discovery and settlement negotiations.

59. In preparation for the mediation sessions, they discussed with their respective counsel documents obtained from defendants pursuant to the informal discovery procedure agreed to in this case, the analysis of experts, and the views of experienced counsel concerning the strengths of claims and defenses. They also reviewed and commented on documents submitted to Judge Phillips and had numerous communications with Lead Counsel concerning the mediations.

60. Mr. Wyatt, Jacksonville and Oklahoma Firefighters actively participated in the settlement negotiations in this case. All three Co-Lead Plaintiffs met with their respective counsel both before and after the mediation sessions to formulate thier respective positions. They evaluated, with assistance from counsel, issues relating to both liability and damages. They went to the mediation sessions informed and with a clear sense of their position on settlement. Both Mr. Wyatt and Mr. Jones attended the initial mediation session before the Honorable Layn R. Phillips (Ret.), in Houston, Texas, and Mr. Keane was in regular telephone contact with his counsel during the Houston mediation. Further, they all participated in person in the first mediation session in Newport Beach, California. All three played an active role in the mediation sessions,

often speaking directly with the mediator and with each other on issues that they felt were important.

61.     In addition to obtaining advice and assistance from their litigation counsel in this action, they also consulted with their respective general counsel with whom they have consulted regularly on numerous matters for years.  This was done at no added expense to the Class to assist them in evaluating the case, the settlement process and the settlement.  Mr. Wyatt's private counsel, Don Nelson, attended mediation sessions in both Houston and Newport Beach.  Marc Edwards, outside general counsel for Oklahoma Firefighters, also attended the first mediation session in Newport Beach.  Robert Klausner, outside counsel for Jacksonville, participated telephonically during the mediation sessions and also advised Mr. Keane by phone on settlement issues.  All of the general counsels were supportive of the Settlement and the process through which it was achieved.

62.     As a result of thier active involvement in this case, the Lead Plaintiffs were well informed as to the strengths and weaknesses of the claims against the various defendants, and the prospects for a recovery from those defendants.  They were also familiar  with issues relating to damages, and the expert's views on damages.  They accepted the $285 million settlement amount recommended by the mediator after extensive negotiations.  On behalf of Lead Plaintiffs and the Class, they approved the terms of the Settlement.

63.     The Lead Plaintiffs also approved the application for a total award of attorneys' fees of 15.438% of the Settlement Fund before deduction of Court-awarded expenses, plus interest at the same rate as earned by the Settlement Fund.  As set forth in

the accompanying Joint Declaration of Lead Plaintiffs Jacksonville Police & Fire Pension Fund and Oklahoma Firefighters Pension and Retirement System, Ex. 6, each of the Lead Plaintiffs independently retained counsel in this case on a contingency basis, with various percentage fees.  The requested 15.438% fee represents the lowest of the three fee agreements entered into between lead plaintiffs and their counsel.  The Lead Plaintiffs support Lead Counsel's request for a total fee award of 15.438%.  They also support Lead Counsel's application for reimbursement of expenses incurred.

### III.   <u>CONCLUSION</u>

64.    For the reasons set forth above and in the accompanying Brief Supporting Settlement and Plan of Allocation and the separate Brief Supporting Fee Application, we respectfully submit that: (i) the Settlement is fair, reasonable and adequate and should be approved; (ii) the Plan of Allocation represents a fair and equitable method for the distribution of the Settlement Amount among Class Members, and should be approved; and (iii) the application for attorneys' fees and reimbursement of expenses should be granted.

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 14th day of February, 2007.


___s/ Jonathan M. Plasse_____
Jonathan M. Plasse
LABATON SUCHAROW & RUDOFF LLP
100 Park Avenue
New York, NY  10017
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

___s/  David R. Stickney_____
David R. Stickney
BERNSTEIN LITOWITZ BERGER &
          GROSSMANN LLP
12481 High Bluff Drive, Suite 300
San Diego, CA 92130-3582
Telephone:  (858) 793-0070
Facsimile  (858) 793-0323


___s/  Michael J. Pucillo_____
Michael J. Pucillo
BERMAN DEVALERIO PEASE  TABACCO
BURT & PUCILLO
Esperante Building
222 Lakeview Avenue, Suite 900
West Palm Beach, FL  33401
Telephone:  (561) 835-9400
Facsimile:  (561) 835-0322